IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

| | | |
|---|---|---|
| SHARON L. MARTIN BRAGG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:09-00106 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.

By Standing Order entered February 9, 2009 (Document No. 4.), this case was referred to the

undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit

Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. §

636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the

Pleadings. (Document Nos. 12 and 13.)

The Plaintiff, Sharon L. Martin Bragg, (hereinafter referred to as "Claimant"), filed

applications for DIB and SSI on August 17, 2004, (protective filing date), alleging disability as of

October 29, 2003, due to bilateral carpal tunnel syndrome, neck pain, back pain, bronchitis, asthma,

and migraine headaches. (Tr. at 39, 128-30, 147, 150-51.) The claims were denied initially and upon

reconsideration. (Tr. at 52-54, 59-61.) On August 15, 2005, Claimant requested a hearing before an

Administrative Law Judge (ALJ). (Tr. at 62.) The hearing was held on November 15, 2006, before

the Honorable Richard N. Owen. (Tr. at 504-37.) By decision dated December 11, 2006, the ALJ

determined that Claimant was not entitled to benefits. (Tr. at 39-47.) By Order of the Appeals Council dated August 22, 2007, the case was remanded to the ALJ for further evaluation of the treating source opinions, Claimant's limitations, and any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles. (Tr. at 48-51.) The Appeals Council directed the ALJ to conduct another hearing and to issue a new decision. (Tr. at 51.)

Pursuant to the Appeals Council's Order, the ALJ conducted a further hearing on April 17, 2008. (Tr. at 430-503.) By decision dated May 23, 2008, the ALJ again determined that Claimant was not entitled to benefits. (Tr. at 20-33.) The ALJ's decision became the final decision of the Commissioner on December 11, 2008, when the Appeals Council denied Claimant's request for review. (Tr. at 9-12.) Claimant filed the present action seeking judicial review of the administrative decision on February 6, 2009, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2008). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the

claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2008). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, October 29, 2003. (Tr. at 22, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of history of bilateral carpal tunnel syndrome, degenerative disc disease of the lumbar spine, degenerative changes of the cervical spine, and headaches. (Tr. at 22, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 24, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light level work as follows:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is limited to standing and walking four to six hours, as well as occasional balancing, stooping, kneeling, crouching, crawling and climbing of ramps and stairs, but cannot perform any climbing of ladders, ropes o[r] scaffolds. The [C]laimant has no manipulative limitations, but should avoid concentrated exposure to extreme cold, dust, fumes, odors, gases, poor ventilation and avoid moderate exposure to hazards.

(Tr. at 25-26, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past

relevant work. (Tr. at 30, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as an unarmed security guard/night watchman and mail clerk, at the light level of exertion. (Tr. at 31, Finding No. 10.) On this basis, benefits were denied. (Tr. at 32, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on February 11, 1958, and was 50 years old at the time of the second administrative hearing, April 17, 2008. (Tr. at 30, 128, 443.) Claimant has a high school education and is able to communicate in English. (Tr. at 31, 150, 155, 443, 510.) In the past, she worked as a sewing machine operator. (Tr. at 30, 151-52, 512, 532.)

4

 The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in evaluating Claimant's symptoms and pain. (Document No. 12 at 13-16.) Particularly, Claimant avers that the ALJ failed to consider that Claimant's chief complaints to her treating physician concerned neck pain and headaches. (Id. at 14.) She asserts that treatment notes spanning several years reflected her complaints of headaches, neck pain, numbness, and radiculopathy. (Id. at 15.) Furthermore, Claimant asserts that her depression, which resulted in an inability to sleep, crying spells, stress, and fatigue, was not considered properly by the ALJ. (Id. at 15-16.)

Assessing Claimant's contention, the Commissioner responds that medical testing and physical examinations failed to reveal any cervical radiculopathy, that she was never diagnosed with migraine headaches, and that she had only mild depression that responded quickly to treatment. (Document No. 13 at 11-15.) Furthermore, the Commissioner asserts that Claimant's inconsistent statements and her reported activities of daily living undermined her credibility. (Id. at 15-16.) Consequently, the Commissioner asserts that the ALJ's credibility assessment is supported by substantial evidence. (Id. at 11-15.)

Second, Claimant alleges that the ALJ erred by not giving great weight to the opinion of her treating physician, Dr. Abigail Winters, regarding manipulative limitations. (Document No. 12 at 16-17.) Claimant asserts that the May 5, 2004, opinion of Dr. Winters that Claimant should avoid use of her hands for any repetitive work, substantiated the opinion of the medical expert, Dr. Cooke, that Claimant had manipulative limitations. (Id. at 16.) She further asserts that the physical residual

5

functional capacity assessment dated December 23, 2004, by reviewing state agency consultant Dr. Gregory S. Phillips, who opined that Claimant was limited in gross manipulation, supported the opinion of the medical expert, Dr. Cooke, that she suffered manipulative limitations. (Id.) Claimant contends however, that the ALJ ignored this evidence and relied on the opinions of the non-examining physician.

The Commissioner asserts that the ALJ specifically explained that Dr. Winters's opinion was inconsistent with the opinion of her orthopaedic surgeon, Dr. Vess; that her treatment notes contained minimal physical findings; and that her opinion was based more on a diagnosis of carpal tunnel syndrome than on Claimant's actual physical condition and diagnostic test results. (Document No. 13 at 17.) The Commissioner notes that the ALJ properly accorded greater weight to the opinion of Dr. Vess because his opinion was supported by laboratory tests and physical findings, and indicated that Claimant's numbness and tingling improved following surgery. (Id. at 17-18.) Dr. Vess's opinion also was supported by the opinion of Dr. Cooke, who opined that Claimant did not have any manipulative limitations. (Id. at 18.) Accordingly, the Commissioner contends that the ALJ's decision to give greater weight to the opinion of Dr. Vess, Claimant's treating orthopaedic surgeon, than to Dr. Winters, her treating physician, is supported by substantial evidence. (Id.)

Finally, Claimant alleges that the ALJ erred in not including all of Claimant's impairments in the hypothetical questions posed to the VE. (Document No. 12 at 17-19.) Claimant asserts that Dr. Cooke testified that it would be reasonable for Claimant not to return to work that required the bilateral repetitive activities of her hands. (Id. at 17.) When posing hypothetical questions to the VE however, the ALJ failed to include any manipulative limitations. (Id. at 17-19.) The Commissioner responds that Dr. Cooke "did not testify that [Claimant] would have manipulative limitations. Rather, he testified that if she returned to her past work, it *probably* would increase the risk of reoccurrence, but he could not be certain." (Document No. 13 at 19.) The Commissioner asserts that Claimant

6

ignores Dr. Cooke's earlier testimony that Claimant had no manipulative limitations and that an individual whose carpal tunnel is caused by repetitive work may be able to return to the same work after surgery where there is no muscle atrophy and the nerve conduction studies are negative. (Id.) The Commissioner notes Dr. Cooke's testimony that Claimant had a successful surgery with no atrophy and with negative post-surgery findings. (Id.) Accordingly, the Commissioner contends that the ALJ's hypothetical questions did not conflict with Dr. Cooke's testimony and were supported by substantial evidence. (Id. at 20.)

Analysis.

1. Treating Physician Opinion.

The undersigned first addresses Claimant's second allegation, that the ALJ erred in not giving controlling or great weight to the opinion of her treating physician, Dr. Winters, regarding manipulative limitations.(Document No. 12 at 16-17.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2008). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's

residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2008).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2008). However, the adjudicator must still apply the applicable

factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2008). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a

9

claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2008). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court

10

must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

The medical record reflects Claimant's treatment by her primary care physician, Dr. Abigail Winters, D.O., from October 22, 2003, through February 29, 2008. (Tr. at 25-30, 218-27, 277-84, 285-97, 300-12, 313-44, 406-18.) Beginning in October, 2003, Claimant complained of hand, elbow, and wrist pain. (Tr. at 283-84.) Claimant reported that she experienced exquisite pain in her wrist that radiated into her forearm when she operated the sewing machines at work. (Tr. at 283.) Dr. Winters noted that Claimant exhibited positive Tinel's and Phalen's signs and directed Claimant to not work for a period of four weeks. (Tr. at 284.) On November 30, 2003, Claimant reported that her hands did not ache as much as they once did. (Tr. at 281.) Based on an EMG and Nerve Conduction Study of Claimant's upper extremities conducted on January 21, 2004 (Tr. at 216-17.), Dr. Winters diagnosed bilateral carpal tunnel syndrome ("CTS") and prescribed pain medication and wrist braces as treatment. (Tr. at 226-27.) The study did not reveal any evidence of cervical radiculopathy. (Tr. at 216-17.) Physical exam on May 5, 2004, revealed positive Phalen's and Tinel's signs in the bilateral wrists. (Tr. at 224-25.) On June 3, 2004, Dr. Winters noted grip strength weakness. (Tr. at 223.) Claimant reported continued wrist pain through September 24, 2004, with reported wrist tenderness on July 30, 2004. (Tr. at 219-22, 277-80, 337-38.) Dr. Winters referred Claimant to Dr. Steven E. Vess, D.O. on October 4, 2004, for a surgical consultation. (Tr. at 289.)

Dr. Vess initially examined Claimant on November 10, 2004, at which time he noted Claimant's complaints of bilateral hand pain, greater on the right than the left hand. (Tr. at 237.) On

11

physical examination, Dr. Vess noted no frank evidence of atrophy, but indicated marked Tinel's and Phalen's signs. (Id.) Dr. Vess recommended right-sided carpal tunnel release, which was performed on December 20, 2004. (Tr. at 329.) Following the release, Dr. Vess noted on January 11, 2005, that Claimant was "making good progress." (Tr. at 237.) Though she experienced some mild peri-incisional tenderness, the numbness and tingling in her fingers prior to surgery almost had disappeared completely. (Id.) He noted that Claimant was very pleased with the results and prescribed continued range of motion, strengthening, and desensitization therapy. (Id.) Dr. Vess ordered aggressive physical therapy, scar mobilization, and desensitization therapy on February 1, 2005, due to decreased grip strength. (Id.) On February 15, 2005, Claimant continued to progress, but had quite a bit of weakness in her right hand. (Tr. at 236.) Physical therapy was continued and on March 3, 2005, Dr. Vess noted that the wound was well healed and that though she had a touch of edema, she was improving. (Id.) Dr. Vess placed Claimant on an as-tolerated status and advised her to continue weight lifting as much as she wanted. (Id.)

Following surgery, Dr. Winters also noted on February 11, 2005, Claimant's complaints of wrist pain, as well as pain in her neck, shoulders, and arms. (Tr. at 327.) On physical exam, Claimant presented with general pain in her left upper extremity with painful range of motion. (Tr. at 238.) On March 14, 2005, Dr. Winters noted continued complaints of neck and wrist pain, which Claimant rated at a level eight out of ten, and further noted that she had muscular spasm and tenderness. (Tr. at 325-26.) An EMG and Nerve Conduction Study performed on June 2, 2005, by Dr. Joe O. Othman, M.D., revealed a suspicious but inconclusive determination of mild cervical radiculopathy of the left upper extremity. (Tr. at 263.) Dr. Othman recommended a MRI due to the mild abnormalities of her neck. (Tr. at 263.) There was no evidence of neuropathy of the wrist. (Id.) Dr. Winters observed on June 10, 2005, that Claimant had CTS of her left hand, for which she was being treated by Dr. Vess.

12

(Tr. at 343.) On September 7, 2005, Claimant presented with positive Tinel's and Phalen's signs in the left wrist and complained of soreness. (Tr. at 313-14.)

On form Claim Reopening Applications for the West Virginia Workers' Compensation Fund, dated March 9, May 5, and December 16, 2004, Dr. Winters opined that Claimant was unable to use her hands "for any repetitive task, including needlework, her hobby." (Tr. at 287, 294, 296.) Dr. Winters noted that Claimant experienced significant pain when performing activities of daily living (Tr. at 287.); that she experienced general wrist pain, numbness, and weakness; and that she was prescribed anti-inflammatory medication, pain medication, and wrist braces for treatment. (Tr. at 294.) On March 9 and May 5, 2004, Dr. Winters opined that Claimant was unable to return to her employment as a seamstress, and that she had been temporarily totally disabled since October 29, 2003. (Tr. at 294, 296.)

Dr. K. M. Monderewicz, M.D., conducted a consultative examination of Claimant on May 19, 2005. (Tr. at 238-48.) Regarding Claimant's CTS, Dr. Monderewicz noted on physical exam that Claimant had no atrophy, warmth, swelling, or radiculopathy; that she was able to make a fist bilaterally; that she had normal grip strength and range of finger motion; and that she was able to write and pick up coins with either hand without difficulty. (Tr. at 241.) Dr. Monderewicz therefore, opined that Claimant's fine manipulation was preserved bilaterally. (Tr. at 243.)

On December 23, 2004, only three days after surgery on Claimant's right wrist, Dr. Gregory S. Phillips, a state agency reviewing consultant, completed a form Physical Residual Functional Capacity Assessment, on which he opined, *inter alia*, that Claimant had limited ability for gross manipulation and should avoid concentrated exposure to extreme cold due to her CTS. (Tr. at 231-32.) In formulating his opinion, Dr. Phillips specifically considered Claimant's EMG and Nerve Conduction Study of January 21, 2004, and noted Dr. Winters's treatment notes from June 3, 2004.

13

(Tr. at 235.) Dr. Phillips indicated Claimant's primary diagnosis as bilateral CTS of a moderate degree. (Tr. at 228.)

Another state agency reviewing consultant, Dr. James K. Egnor II, M.D., completed a form Residual Functional Capacity Assessment on July 1, 2005. (Tr. at 249-56.) Dr. Egnor noted Claimant's CTS as a secondary diagnosis, and assessed manipulative limitations to include limited skin receptors or feeling. (Tr. at 249, 252.) He further opined that Claimant should avoid concentrated exposure to extreme cold and vibration due to pain. (Tr. at 253.) Dr. Egnor noted Claimant's activities to include performing self care with difficulty, preparing simple meals, cleaning house, doing laundry, walking, driving, shopping, paying bills, sewing, crocheting, and working crossword puzzles. (Tr. at 254.)

In a letter to Claimant's attorney dated December 5, 2005, Dr. Vess opined that Claimant was "temporarily and totally disabled from the time of her initial surgery on December 20, 2004, until March 3, 2005 from [her] injury." (Tr. at 299.) On March 5, 2005, Dr. Vess placed Claimant on an as-tolerated status and allowed weight lifting as tolerated, without restrictions. (Id.)

On January 18, 2006, Claimant reported to Dr. George Orphanos, M.D., on medical evaluation, that she experienced pain and numbness in her hands bilaterally when she worked in a sewing factory. (Tr. at 268.) On exam, Dr. Orphanos noted no definite restriction of range of wrist motion and that Claimant's finger range of motion was normal. (Id.) Tinel's sign produced symptoms on the left and right only locally, with no extension to the digits. (Id.) He further noted subjective paresthesia with flexion of the right wrist that affected all fingers, and minimal paresthesia on the left. (Id.) Dr. Orphanos noted that objectively, Claimant's carpal tunnel release on the right resulted in objective improvement, but subjectively, no improvement. (Tr. at 269.) He also noted that the most recent EMG and Nerve Conduction Study did not support a finding of any nerve compression of the

14

wrist. (Id.) Dr. Orphanos therefore, opined that clinically, Claimant presented findings less than mild involving the bilateral hands. (Id.) Dr. Orphanos noted that Claimant presented without paravertebral muscle spasm in the cervical spine and with normal range of motion of her upper extremities. (Tr. at 268.) He determined that Claimant was stable and recommended a three percent whole person impairment for each hand. (Tr. at 269.)

In a re-check of Claimant's right hand on April 24, 2006, Dr. Winters again diagnosed bilateral CTS, right greater than the left. (Tr. at 311-12.) On May 24, 2006, Claimant complained of wrist and neck pain with paresthesia and rated the pain at a level six out of ten. (Tr. at 309-10.) Claimant continued to complain of wrist and neck pain through October 19, 2006 (Tr. at 301-308.), and then from November 20, 2006, through January 19, 2007. (Tr. at 414-16.) These latter treatment notes did not reflect any further subjective complaints regarding Claimant's CTS or any other objective evidence of CTS.

At the administrative hearing, medical expert Dr. Charles Cooke, testified that Claimant's CTS resolved after surgery and did not result in any manipulative limitations. (Tr. at 464-88.) Dr. Cooke thoroughly discussed the medical evidence of record and testified that though Claimant presented with symptoms of CTS post-surgery, such symptoms were usually prominent after surgery because the ligament that holds the nerves in place in the wrist was severed. (Tr. at 467.) He noted that Claimant had no reflex changes or muscle atrophy, and had a normal EMG following surgery. (Tr. at 471-75.) He therefore, ruled out any cervical radiculopathy. (Id.) Dr. Cooke opined that Claimant did not have any impairment that reasonably could be expected to produce the level of pain alleged by Claimant. (Tr. at 486.)

In his decision, the ALJ did not give controlling weight to Dr. Winters's assessment that Claimant was unable to perform repetitive tasks with her hands from October, 2003, because (1) the

15

opinion was inconsistent with Dr. Vess's statement that she was disabled only from November, 2004, through March, 2005; (2) her treatment notes identified few specific physical findings; and (3) her opinion was based more on a diagnosis of CTS instead of on Claimant's physical condition and diagnostic tests. (Tr. at 30.) The ALJ accorded greater weight to the opinion of Dr. Vess, Claimant's treating specialist for CTS, but noted that such opinion did not warrant a finding of disability because it was for a period of less than twelve months and did not identify any specific limitations regarding Claimant's functioning. (Tr. at 30.) The ALJ also gave greater weight to the opinions of the state agency consultants, Drs. Phillips and Egnor, and the medical expert, Dr. Cooke, as they reviewed all the evidence of record at the time of their opinions, which included the treating physicians' opinions and the consultative examination by Dr. Monderewicz. (Tr. at 30.)

 The undersigned finds that based on the foregoing, the ALJ's decision to not give controlling weight to Dr. Winters's opinions is supported by substantial evidence. In according greater weight to Dr. Vess's opinion, the ALJ acknowledged that he, too, was Claimant's treating physician for CTS, and that his treatment notes and opinions were based not only on Claimant's subjective reports that the numbness and tingling nearly had disappeared after surgery, but the EMG and Nerve Conduction Studies, as well as physical findings on examination. By March, 2005, Dr. Vess did not impose any restrictions on Claimant's ability to lift weight. Dr. Vess's opinions were in line with the opinions of Drs. Phillips and Egnor, who opined, after reviewing the medical evidence through the date of their assessments, that Claimant's CTS resulted in only limited gross manipulation and skin receptors, but was capable of performing work at the light exertional level. Thus, the state agency reviewing consultants' opinions were inconsistent with Dr. Winters's assessment of total disability. His opinions were further inconsistent with the physical findings of Drs. Monderewicz and Orphanos that Claimant's CTS essentially was no more than a mild impairment. Finally, Dr. Winters's opinions

16

were inconsistent with the testimony of Dr. Cooke who did not find the need to assess any manipulative limitations, with the exception that Claimant should not perform her past relevant work as a sewing machine operator or seamstress. Accordingly, the undersigned finds that Claimant's argument in this regard is without merit and that substantial evidence supports the ALJ's decision that Dr. Winters's opinion was not entitled controlling weight.

2. Assessment of Pain.

Claimant next alleges that the ALJ erred in assessing her credibility when he failed to acknowledge her reports of neck pain, radiculopathy, and headaches to her physicians, as well as her major depressive disorder. (Document No. 12 at 13-16.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2008); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and

17

416.929(c)(4) (2008).  Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . .  Factors relevant to your symptoms, such as pain, which we will consider include:
>
>> (i) Your daily activities;
>>
>> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>>
>> (iii) Precipitating and aggravating factors;
>>
>> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>>
>> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>>
>> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
>>
>> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2008).

> SSR 96-7p repeats the two-step regulatory provisions:
>
>> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.
>>
>> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects

18

of the individual's symptoms to determine the extent to which the symptoms limit the
individual's ability to do basic work activities.   For this purpose, whenever the
individual's statements about the intensity, persistence, or functionally limiting
effects of pain or other symptoms are not substantiated by objective medical
evidence, the adjudicator must make a finding on the credibility of the individual's
statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the

"type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to

alleviate pain or other symptoms" in assessing the credibility of an individual's statements.

Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as

step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a

claimant's ability to function along with the objective medical and other evidence in determining

whether the claimant's impairment is "severe" within the meaning of the Regulations.   A "severe"

impairment is one which significantly limits the physical or mental ability to do basic work activities.

20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence

of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a

claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig,

76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the

individual's statements based on a consideration of the entire case record"). For example, the

allegations of a person who has a condition capable of causing pain may not be rejected simply

because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or]

redness" to corroborate the extent of the pain. Id. at 595. Nevertheless,  Craig does not prevent an

ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating

evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ

19

rejects allegations of pain <u>solely</u> because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 25.) The ALJ found at the first step of the analysis that Claimant's "medically determinable impairments could reasonably be expected to produce some of the alleged symptoms." (Tr. at 25.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 25-30.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained. . . ." (Tr. at 25.).

In assessing Claimant's credibility, the ALJ summarized the medical and opinion evidence of record, as well as Claimant's statements and testimony that she quit working in October, 2003, due to pain in her hands. (Tr. at 25-30.) Claimant further alleged an inability to work due to severe neck pain, difficulty breathing, difficulty lifting due to low back pain and lower extremity weakness, headaches, and general fatigue. (Tr. at 25.) Claimant testified that pain medications only minimally relieved the pain and that she suffered fatigue that caused her to take naps two or three times a day. (Tr. at 28, 454-55, 457.) The ALJ also acknowledged Claimant's testimony that she could walk only 100 yards and sit for 30 minutes before experiencing back pain. (Tr. at 28, 458.) She further testified that she could not stand longer than 15 minutes and that she could lift a gallon of milk, but often dropped it. (Tr. at 28, 458-59.) Regarding activities of daily living, Claimant testified that she could do housework with her daughter's assistance, that she stayed at home all day, and that she no longer could do needlework as a hobby because of her hands. (Tr. at 28, 460-61.)

20

A. *Headaches*.

The ALJ acknowledged Claimant's testimony that she experienced headaches two to three times a week, which required her to lie down for two hours. (Tr. at 27, 459-60.) However, the ALJ determined that the complaints of headaches contained in the medical records were sporadic in nature and that Claimant never sought follow-up or acute treatment. (Tr. at 27.) The medical records evidence Claimant's complaints of headaches on several occasions. On November 30, 2003, Claimant complained of a headache with nausea and photophobia. (Tr. at 281.) Dr. Winters noted Claimant's complaints of a headache lasting several days on July 2, 2004, and she diagnosed migraine headaches. (Tr. at 220-21.) Claimant again reported to Dr. Winters that she experienced headaches on April 24, September 22, and October 19, 2004, as well as on February 11 and March 14, 2005. (Tr. at 301, 303, 311, 325, 327.) On September 7, 2005, Claimant reported that the headaches had been "pretty bad" that month and that she experienced them three or four times a week. (Tr. at 313.) On that date, Dr. Winters diagnosed cervical headaches. (Tr. at 314.) Claimant continued to report headaches from November 20, 2006, through February 19, 2007 (Tr. at 413-16.), and again on October 4, 2007, and February 29, 2008. (Tr. at 356, 406.) Dr. Cooke testified however, that there was no neurological evidence of migraine headaches. (Tr. at 24, 486.)

The undersigned finds that the ALJ's assessment of Claimant's credibility regarding headaches is supported by substantial evidence. Though Claimant complained of headaches on scheduled medical appointments, primarily to Dr. Winters, she never sought unscheduled treatment for the headaches, and received little treatment for them in general. Furthermore, the medical evidence does not reflect any physical findings to support the severity of the headaches as indicated by Claimant. See Mickles v. Shalala, 29 F.3d 918, 928 n.6 (4th Cir. 1994)(finding that though the medical evidence demonstrated that the claimant suffered tension headaches, the evidence did not

"reflect any physical finding likely to create symptoms of the severity testified to by the claimant with regard to her headaches."). Accordingly, the undersigned finds that the ALJ's credibility assessment regarding Claimant's headaches is supported by substantial evidence.

B. *Neck Pain*.

The ALJ acknowledged Claimant's complaints of neck pain, but noted that testing was inconclusive regarding any radiculopathy. (Tr. at 28.) As noted above, the EMG and Nerve Conduction Study on June 2, 2005, was suspicious, but inconclusive for a mild cervical radiculopathy of the left upper extremity. (Tr. at 263.) An x-ray of Claimant's cervical spine on May 19, 2005, revealed only mild degenerative changes. (Tr. at 245.) Dr. Cooke explained at the hearing that these mild degenerative changes were common in people of Claimant's age. (Tr. at 487.) He further testified that there was no evidence of radiculopathy. (Tr. at 471-72.) As discussed above, Dr. Monderewicz noted that Claimant had no atrophy of her hands, had normal grip and motor strength of her upper extremities, and was able to write and pick up coins with either hand. (Tr. at 241-43.) He specifically noted that though she had lower cervical spine tenderness and spasming, as well as decreased range of neck motion, there was no evidence of radiculopathy to the upper extremities. (Tr. at 243.) Dr. Orphanos noted that Claimant had no atrophy or muscle spasming of the cervical spine and that she had normal range of upper extremity motion. (Tr. at 268.) He regarded her impairment as less than mild. (Tr. at 269.)  Based on the foregoing medical evidence, the undersigned finds that the ALJ's determination that Claimant's complaints of radiculopathy lacked credibility is supported by substantial evidence.

C. *Depression*.

The ALJ further acknowledged Claimant's depression and related symptoms. (Tr. at 23.) Though Claimant underwent mental health treatment, the ALJ noted that such treatment was not

initiated until January 7, 2008, which was more than four years after she stopped working and was when Claimant was going through a divorce. (Tr. at 23, 346.) Claimant reported depression, low mood, crying spells, and fatigue. (Id.) On mental status exam however, she presented with a full affect, euthymic mood, connected and logical thought processes, satisfactory attention, intact insight and judgment, and forward thinking. (Tr. at 23, 347.) She was diagnosed with major depressive disorder, single episode, moderate and was assessed a GAF of 55.[1] (Id.) She was prescribed Cymbalta, which Claimant reported on January 28 and February 11, 2008, had improved her depression. (Tr. at 23, 348, 350.) Claimant's mental status exams essentially remained unchanged on those two days. (Id.) Claimant subsequently was placed on Effexor, which helped her rest two additional hours a night. (Tr. at 23, 420.) On April 7, 2008, Claimant denied any major depression. (Id.)

The ALJ determined that Claimant's mental impairment did not cause more than minimal limitations in her ability to perform basic mental work activities. (Tr. at 23.) Specifically, he found that Claimant's depression resulted in no more than mild restrictions of activities of daily living, and that there was no evidence that the depression affected her social functioning, concentration, persistence, or pace, or that she experienced any extended episodes of decompensation. (Id.) On a form function report dated October 4, 2004, Claimant reported that she cooked breakfast, cleaned house, did lawn work and laundry, ran errands, took care of her dogs, helped neighbors with their lawns and odd jobs around the house, prepared dinner, washed dishes, and watched television. (Tr.

---

[1] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994)

at 169.) She indicated that she performed her own personal care with some difficulty raising her arms and using her hands. (Tr. at 170.) Claimant reported that she went outside 20 to 30 times a day, that she drove a vehicle and shopped for food and general needs three times a week for two to three hours, that she paid her bills, and that she sewed, knitted, played cards, cooked, and went camping and fishing for two hours a day, but that such activities were becoming difficult to do due to hand and neck pain. (Tr. at 172-73.)

In addition to acknowledging Claimant's activities of daily living, the ALJ noted in his decision that Claimant made several inconsistent statements. For instance, Claimant was involved in an altercation, or fist fight, but reported to her mental health provider that she incurred injuries from falling down some stairs. (Tr. at 28, 346, 354, 356.) Furthermore, though Claimant testified that she experienced sleep difficulties, she reported to her mental health provider that the medications resulted in an additional two hours of sleep per night. (Tr. at 28, 420, 457.)

Based on the foregoing, the undersigned finds that the ALJ's assessment of Claimant's mental impairment, in that it quickly responded to treatment and resulted in minimal limitations in her ability to perform mental work activities, is supported by substantial evidence.

3. <u>Hypothetical Questions</u>.

Finally, Claimant alleges that the ALJ erred when he failed to include manipulative limitations in the hypothetical questions posed to the VE. (Document No. 12 at 17-19.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the

24

necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

In the ALJ's hypothetical questions to the VE, he included all of Claimant's impairments that were supported by the record. (Tr. at 495-502.) Though Dr. Cooke testified that if Claimant returned to her past relevant work, which involved repetitive use of her hands, it could increase her risk of reoccurrence (Tr. at 488-91.), he did not testify that Claimant would have manipulative limitations. In fact, he testified that Claimant would not have any manipulative limitations. (Tr. at 475.) Rather, Dr. Cooke explained that an individual whose CTS is caused by repetitive work, may be able to return to work after successful surgery where there is no atrophy of the muscles and there are normal nerve conduction studies. (Tr. at 488.) Dr. Cooke indicated in the instant case that there was no atrophy and that the EMG studies post-surgery were normal. (Tr. at 471-72, 488.)

Accordingly, based on Dr. Cooke's testimony and the other medical and opinion evidence of record, the undersigned finds that the ALJ's decision that Claimant's impairments did not result in any manipulative limitations is supported by substantial evidence of record. Because the evidence did not support any manipulative limitations, the ALJ was not required to include such limitations in his hypothetical questions posed to the VE. The undersigned finds that Claimant's argument in this regard is without merit.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the

25

Plaintiff's Motion for Judgment on the Pleadings (Document No. 12.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 13.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Judge Berger, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 26, 2010.

R. Clarke VanDervort
United States Magistrate Judge

26